DAVID B. SHANIES LAW OFFICE
411 Lafayette Street, 6th Floor
New York, New York 10003
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUDDY A. QUEZADA,<br><br>                    Plaintiff,<br><br>      – against –<br><br>CHARLES J. HYNES (*in his official capacity*),<br>THOMAS J. BUDA, ALBERT A. PICA, JOSEPH<br>CIMINO, RENEE KRELIK, DONALD J. LASALA,<br>CHRISTOPHER SALSARULO, and THE CITY OF<br>NEW YORK,<br><br>                    Defendants. | 16-CV-6577 (MKB) (SMG)<br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Ruddy A. Quezada, by and through his attorney, David B. Shanies, as and for his First Amended Complaint against the above-captioned Defendants, alleges as follows:

## NATURE OF THE ACTION

1.      Mr. Quezada brings this action under 42 U.S.C. § 1983 and New York State law, seeking to recover damages caused by the denial of his constitutional and legal rights and his resulting wrongful conviction and loss of liberty.

2.      In 1993, Mr. Quezada was wrongfully convicted of murder for the October 1991 shooting of José Rosado in East New York, Brooklyn – a crime Mr. Quezada did not commit. He was consequently imprisoned until 2015, when his conviction was vacated and all charges dismissed.

1

3.     The misconduct that caused Mr. Quezada's wrongful conviction included the abuse of legal process, including a material witness order;[1] the suppression of *Brady* information;[2] the fabrication of evidence; and the presentation of false testimony and arguments.

4.     Mr. Quezada's wrongful conviction was a direct consequence of acute and systemic prosecutorial, investigative, and police misconduct attributable to municipal policies, practices, and customs of the City of New York to permit and encourage violations of the constitutional rights of criminal suspects and defendants, including through the deliberate indifference of policy-making officials, acting on behalf of the City of New York, to such violations.

5.     Former Kings County District Attorney ("KCDA") Charles J. Hynes, as a matter of policy, practice, and custom: (a) permitted and encouraged an illegal "Hotel Custody" program, which was used to secretly coerce witnesses to give false or unreliable testimony

---

1.   A material witness order is a legal mechanism established by Article 620 of the New York Criminal Procedure Law.  Where a prosecutor can demonstrate that a witness has information relevant to a criminal case and would not be "responsive to a subpoena," the court may issue a material witness order, commanding the witness to appear before the court for a determination of whether he or she should be adjudicated a material witness and have bail set to ensure his or her attendance.  N.Y. Crim. Proc. L. §§ 620.10, 620.20, 620.30.

     If, in addition to making that showing, a prosecutor demonstrates that the witness would be "unlikely to respond to such an order" (or had previously disregarded one), the court may issue an arrest warrant directing a police officer "to take such prospective witness into custody" and bring him or her before the court "forthwith" for a material witness proceeding.  N.Y. Crim. Proc. L. § 620.30.

     A person arrested on such a warrant, in addition to being brought before the court "forthwith," has the right to "a prompt hearing" at which he or she "possesses all the rights, and is entitled to all the court instructions" applicable to a defendant being "arraigned upon a felony complaint in a local criminal court."  N.Y. Crim. Proc. L. § 620.40.  The witness has the rights to: (a) counsel, (b) have bail set, (c) testify on his or her own behalf, (d) compulsory process, and (e) a presumption against detention as a material witness (which the prosecutor can overcome only by meeting the burden of proof through sworn testimony).

     A material witness order is an extremely powerful tool, particularly where an arrest is authorized, and the standards and judicial oversight governing material witness orders are strict.

2.   Throughout this complaint, the term "*Brady*" information refers to information that must be disclosed to a criminal defendant under the Fifth and Fourteenth Amendments to the U.S. Constitution, including exculpatory, impeachment, and other favorable information, as explained in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976), *United States v. Bagley*, 473 U.S. 667 (1995), and their progeny.

through the KCDA's misuse of subpoenas, material witness orders, and their powers of arrest and interrogation; (b) permitted and encouraged the concealment of *Brady* information; and (c) permitted and encouraged his employees to lie to or mislead courts, defense attorneys, and criminal defendants in order to cover up their unlawful behavior.

6.      In the rare case where such illicit misconduct was exposed, the KCDA took no disciplinary action against the offending employees, but instead praised and promoted them, thereby condoning their behavior and encouraging future constitutional violations to occur, including those directed against Mr. Quezada.

7.      One of those employees was KCDA prosecutor Ephraim "Effie" Shaban, whose first homicide trial was the Quezada case.

8.      In the weeks leading up to that trial, Mr. Shaban learned that his sole witness, Sixto Salcedo, recanted his earlier identification of Mr. Quezada and refused to testify at trial.

9.      Mr. Salcedo was the entire case against Mr. Quezada.  There was no other witness and no physical or forensic evidence implicating Mr. Quezada in the crime.

10.     During the trial, Mr. Shaban sent a request to the KCDA detective investigators ("DI") bureau to arrest Mr. Salcedo and hold him in custody in accordance with their policies and practices.  As a result, four police officers arrested Mr. Salcedo and held him unlawfully in so-called "Hotel Custody" until he agreed to testify, falsely, that he saw Mr. Quezada shoot Mr. Rosado.

11.     The Hotel Custody program was a longstanding (and now infamous) practice, employed by the KCDA under former District Attorney ("DA") Charles J. Hynes, whereby individuals who refused to cooperate with prosecutors were arrested without judicial process, incarcerated in hotel rooms, and coerced into testifying as prosecution witnesses.

12.     Former DA Hynes' Hotel Custody program has received widespread media attention and earned well-deserved condemnation by judges, legal scholars, and practitioners alike.[3]  The illegal practice played a key role in the late Kenneth P. Thompson's successful campaign in 2014 to unseat former DA Hynes, then a 24-year incumbent, as District Attorney.

13.     The Hotel Custody program earned from the press the derisive moniker of "Hotel Hynes," and was forcefully denounced by former DA Thompson as "Guantanamo on the Hudson" and a practice with "no place in civilized society."[4]

14.     The KCDA under former DA Thompson acknowledged that the unlawful Hotel Custody program existed under his predecessor and assured the public that the "practice stopped when District Attorney Thompson took office."[5]

15.     Mr. Quezada's case presents the most egregious example of the abusive Hotel Custody practice that has been documented to date.

16.     As Mr. Quezada's trial date approached, the trial prosecutor, Mr. Shaban, obtained a material witness order and arrest warrant for Mr. Salcedo by submitting to the court a sworn statement that Mr. Salcedo "would not appear voluntarily" and falsely representing that he had disregarded a subpoena.

---

3.   *See, e.g.*, *1993 Murder Conviction Vacated; Brooklyn Prosecutor Said Evidence Was Withheld*, THE NEW YORK TIMES, Aug. 31, 2015 (*available at* goo.gl/hsxIk9); *Trial And Error: A Man Convicted of Murder Wins Release, and Questions of Responsibility Linger*, PROPUBLICA, Sept. 15, 2015 (*available at* goo.gl/tDhvfP); *Man convicted by 'lying prosecutor' released from prison after 24 years*, THE NEW YORK POST, Sept. 1, 2015 (*available at* http://nyp.st/1UiUZBa); *Warrant 'found': DA email shocker to set free man convicted of murder*, THE NEW YORK DAILY NEWS, Sept. 1 2015 (*available at* goo.gl/z7Y6EY); *Hell in 'Hotel Hynes'* – *Brooklyn DA accused of coercing witnesses to give false testimony, suit claims*, THE NEW YORK POST, May 30, 2013 (*available at* http://nyp.st/1ihSR8X); *Brooklyn Prosecutor's Office Is Accused of Detaining Trial Witnesses*, THE NEW YORK TIMES, May 29, 2013 (*available at* goo.gl/rLGqUi); *A Powerful Legal Tool, and Its Potential for Abuse*, PROPUBLICA, Aug. 16, 2013 (*available at* goo.gl/ZVvLU4).

4.   *See Brooklyn DA flip-flopped on 'illegal' witness detention: docs*, THE NEW YORK POST, Mar. 9, 2015 (*available at* http://nyp.st/1AWKofr).

5.   *Id.*

4

17.     During the trial, KCDA DIs Renee Krelik, Donald J. Lasala, and Christopher Salsarulo (collectively, the "DI defendants"), along with former NYPD detective Thomas J. Buda, illegally arrested Mr. Salcedo and brought him to a hotel, flouting a court order requiring that the witness be brought before a judge, and denying the witness his statutory and constitutional rights (including the rights to an attorney and to a hearing).

18.     One or more of the DI defendants and Detective Buda threatened Mr. Salcedo with prosecution and imprisonment if he refused to testify.

19.     The DI defendants then unlawfully detained Mr. Salcedo in a hotel before bringing him to the District Attorney's office, where he was again threatened with prosecution and imprisonment if he continued to refuse to testify.

20.     As a result of the Defendants' coercion, Mr. Salcedo took the witness stand and falsely identified Mr. Quezada as the man who shot Mr. Rosado in October 1991.

21.     Mr. Shaban hid from both the defense and the jury the fact that Mr. Salcedo had been arrested, threatened, and illegally held in the custody of the KCDA.

22.     In his summation, Mr. Shaban urged the jury to convict Mr. Quezada and disregard the *three alibi witnesses* who testified for the defense, arguing that Mr. Salcedo was to be believed because he "came forward to testify" and "was not hesitant."  Mr. Shaban repeatedly emphasized this point to the jury, referring to Mr. Salcedo supposedly "coming forward" to testify at least five times.

23.     More than 20 years later, when Mr. Salcedo's arrest and imprisonment were brought to light, Retired Judge Abraham Gerges issued his own rebuke, telling a reporter, "[t]here is no question it should've been turned over" at Mr. Quezada's trial.[6]

24.     By lying to the jury and concealing the arrest and detention of his key witness,

---

6.   *Trial And Error*, ProPublica, Sept. 15, 2015 (*available at* goo.gl/tDhyfP).

Mr. Shaban convinced jurors to ignore the defense's three alibi witnesses, former neighbors of Mr. Quezada's with no relation to him and no criminal history.

25.     Mr. Quezada was convicted of second degree murder.

26.     After obtaining the conviction, Mr. Shaban and others in the DA's Office spent years covering up the misconduct, falsely denying the existence of the material witness order used to imprison and coerce Mr. Salcedo, and repeatedly lying to state and federal courts.

27.     Former Assistant District Attorney Marie-Claude Wrenn, an Appeals Bureau attorney who was responsible for the Quezada case for more than 15 years of post-conviction litigation, repeatedly lied about the material witness order to the state court judge who presided over Mr. Quezada's first state post-conviction motion (2003-2007), the federal district court judge who presided over Mr. Quezada's habeas corpus petition (2008-2015), and the state court judge who presided over Mr. Quezada's second state post-conviction motion (2015-2016).

28.     Ms. Wrenn committed perjury regarding the material witness order in both a federal deposition and state post-conviction proceedings.

29.     The same day former DA Thompson decided to dismiss all charges against Mr. Quezada, he fired Ms. Wrenn for the misconduct she committed in Mr. Quezada's case.

30.     Through her egregious behavior, Ms. Wrenn earned the dubious distinction of becoming *the only* KCDA prosecutor to be fired for prosecutorial misconduct since former DA Hynes took office in 1990.

31.     Before that moment arrived, and in the face of that misconduct, Mr. Quezada persisted in litigating his case in the state and federal courts for more than 20 years.

32.     In 2010, Mr. Quezada obtained from the Second Circuit the extraordinary remedy of leave to file a second habeas corpus decision under 28 U.S.C. § 2244.  *Quezada v. Smith*, 624

F.3d 514 (2d Cir. 2010).  This was the first published Second Circuit decision granting leave to file a "second or successive" habeas petition since the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

33.     From 2011 through 2015, Mr. Quezada conducted discovery in his federal habeas corpus proceedings, whereby he uncovered the existence of the material witness order.

34.     In 2015, Mr. Quezada commenced a second round of state post-conviction proceedings.

35.     In August 2015, after an evidentiary hearing, former DA Thompson agreed to the vacatur of Mr. Quezada's conviction, dismissed the indictment against him, and fired Ms. Wrenn for her misconduct in this case.

36.     This lawsuit seeks to hold the defendants accountable for the devastating harm they caused to Mr. Quezada by virtue of his wrongful conviction and deprivation of liberty, a 24-year ordeal.

## JURISDICTION AND VENUE

37.     This action arises under 42 U.S.C. §§ 1983 and 1988, and under the laws of the State of New York.

38.     Jurisdiction lies in this Court under its federal question, civil rights, and supplemental jurisdiction, 28 U.S.C. §§ 1331, 1343, and 1367.

39.     Venue is proper in this Court under 28 U.S.C. § 1391 because Mr. Quezada's claims arose in the Eastern District of New York.

40.     Mr. Quezada has complied with the requirements of New York General Municipal Law ("GML") § 50-i by serving a notice of claim on the City of New York Office of the Comptroller in November 2015.

## PARTIES

41.     Plaintiff Ruddy A. Quezada is an individual residing in New Jersey.

42.     Defendant Charles J. Hynes is an individual residing in New York.  At all times relevant to the claims against him, former DA Hynes was the Kings County District Attorney, acting under color of law pursuant to the statutes, ordinances, regulations, policies, and customs of the City and State of New York.  Former DA Hynes was at all relevant times a policy maker for the KCDA with respect to the allegations set forth in this complaint.  Mr. Quezada sues Former DA Hynes in his official capacity.

43.     Defendant Thomas J. Buda is an individual residing in New York.  At all times relevant to the claims against him, Mr. Buda was a detective employed by the New York City Police Department ("NYPD"), acting under color of law pursuant to the statutes, ordinances, regulations, policies, and customs of the City and State of New York.

44.     Defendant Albert A. Pica is an individual residing in New York.  At all times relevant to the claims against him, Chief DI Pica was a detective investigator employed by the KCDA, including in the position of Chief Detective Investigator, acting under color of law pursuant to the statutes, ordinances, regulations, policies, and customs of the City and State of New York.  Mr. Pica was at all relevant times a policy maker for the KCDA with respect to the policies, practices, and customs underlying allegations set forth in this complaint concerning the KCDA's "Hotel Custody" program.  Mr. Quezada sues Mr. Pica in his individual and official capacities.

45.     Defendant Joseph Cimino is an individual residing in New York.  At all times relevant to the claims against him, Supervising DI Cimino was a supervising detective investigator employed by the KCDA and the direct supervisor of Defendants Krelik, Lasala, and

Salsarulo, acting under color of law  pursuant to the statutes, ordinances, regulations, policies, and customs of the City and State of New York.

46.     Defendant Renee Krelik is an individual residing in New York.  At all times relevant to the claims against her, DI Krelik was a detective investigator employed by the KCDA, acting under color of law  pursuant to the statutes, ordinances, regulations, policies, and customs of the City and State of New York.

47.     Donald J. Lasala is an individual residing in Florida.  At all times relevant to the claims against him, DI Lasala was a detective investigator employed by the KCDA, acting under color of law  pursuant to the statutes, ordinances, regulations, policies, and customs of the City and State of New York.

48.     Defendant Christopher Salsarulo is an individual residing in New Jersey.  At all times relevant to the claims against him, DI Salsarulo was a detective investigator employed by the KCDA, acting under color of law  pursuant to the statutes, ordinances, regulations, policies, and customs of the City and State of New York.

49.     Defendant City of New York, of which Kings County (Brooklyn) is a subdivision, is a municipality and a political subdivision of the State of New York, existing by virtue of the laws of the State of New York.  Defendant City of New York is and was at all relevant times responsible for the policies, customs, and practices of the KCDA.

**FACTS**

50.     On the evening of October 19, 1991, Mr. Rosado was shot and killed in a drive-by shooting in East New York, Brooklyn.  The perpetrator(s) drove past a group of people standing near 422 New Lots Avenue and fired a rapid series of shots that bystanders described as a machine gun.  Mr. Rosado, the only person struck, died from his wounds.

**John Delacruz Falsely Accuses Ruddy Quezada to Settle a Score**

51.     Two men who claimed to have witnessed the shooting (and who the following day would accuse Mr. Quezada of being the shooter) were John Delacruz and his good friend, Mr. Salcedo.  Mr. Salcedo would later become the key prosecution witness at Mr. Quezada's trial.

52.     Unknown to police at the time, Mr. Delacruz had a pre-existing personal conflict with Mr. Quezada, arising from a family dispute.

53.     Mr. Quezada, Mr. Delacruz, and Mr. Salcedo all hailed from the same part of the Dominican Republic and had known one another for years.  Mr. Delacruz had fathered a child with a young relative of Mr. Quezada's, and Mr. Quezada believed that Mr. Delacruz had abandoned the child's mother.  The two men had argued over that issue in the weeks leading up to October 19th.

54.     On October 19th, Mr. Delacruz and Mr. Quezada saw each other in a restaurant adjacent to the bodega where Mr. Quezada worked, located at 577 New Lots Avenue, about five blocks from the scene of the shooting.  They had a heated discussion over the family dispute.

55.     At one point, Mr. Quezada mocked Mr. Delacruz about neighborhood rumors that Mr. Delacruz was a police informant.  In East New York in the early 1990s, that was a grave insult and a dangerous rumor, even more so because it was true.

56.     Mr. Delacruz told Mr. Quezada that he would make sure Mr. Quezada ended up in a jail cell.  He would soon make good on that threat.

57.     The argument moved outside the restaurant, where a fistfight broke out before the two men were quickly separated.  At that point, Mr. Delacruz pulled out a pistol and fired two shots in Mr. Quezada's direction, which fortunately hit no one.

58.     Mr. Quezada ran away and soon made his way upstairs in the apartment building above the bodega where he worked.  Mr. Quezada knew a number of people in the building, having previously lived there.  Mr. Quezada went to the apartment of his friend Aida Pimentel, where she lived with her husband Jay and the couple's son.  Ms. Pimentel and her husband encouraged Mr. Quezada to stay inside with them and out of harm's way.

### The Shooting of José Rosado

59.     Later that evening, the group that was gathered in Ms. Pimentel's apartment, including Mr. Quezada, heard from down the street the burst of gunfire in which Mr. Rosado was shot.  It was a rapid burst of gunshots, that sounded like a machine gun.

60.     Three alibi witnesses, including Ms. Pimentel and two other tenants in her building, would later testify at trial that they were inside the apartment building at 577 New Lots Avenue with Mr. Quezada at the time of the shooting.

61.     None of the alibi witnesses was related to Mr. Quezada, and none had any criminal record.

### The False Accusation of Ruddy Quezada

62.     The following day, Mr. Delacruz went to the police, accompanied by Mr. Salcedo, and accused Mr. Quezada of the Rosado shooting.

63.     Mr. Salcedo did not want to get involved, but after Mr. Delacruz's repeated pleas, Mr. Salcedo reluctantly agreed to go with him.

64.     Mr. Salcedo would later testify that during that interview, the lead detective, Detective Buda, pressured him to corroborate Mr. Delacruz's account of the shooting.

65.     At the time, Mr. Salcedo was serving a term of supervised release for a federal drug conviction and was not a United States citizen.

66.     Eventually, Mr. Salcedo agreed to give a statement and repeated Mr. Delacruz's version of events.

67.     Armed with two eyewitness statements, Detective Buda arrested Mr. Quezada the next day.  Shortly thereafter, prosecutors indicted Mr. Quezada for Mr. Rosado's murder, under Kings County Indictment Number 13306/91.  Over the next year and a half, the parties prepared for trial.

### Sixto Salcedo Recants, and the Prosecution's Case Falls Apart

68.     With no weapon or physical evidence implicating Mr. Quezada in Mr. Rosado's shooting, the prosecution's case rested entirely on Mr. Delacruz and Mr. Salcedo.  Mr. Delacruz died before the trial, however, Mr. Salcedo was the only witness remaining.

69.     When detectives attempted to contact him about testifying at Mr. Quezada's trial, however, Mr. Salcedo recanted his earlier identification, refused to testify, and made it clear that he did not wish to cooperate with the prosecution.

70.     Mr. Salcedo told Detective Buda and/or Mr. Shaban that he never actually saw who fired the shots that killed Mr. Rosado.

71.     Mr. Salcedo told the defendants that he echoed Mr. Delacruz's story only after repeatedly being assured that he would never have to testify.

### Hotel Custody

72.     With the trial approaching and Mr. Salcedo recanting and refusing to testify, Mr. Shaban submitted an *ex parte* application to the trial court for the issuance of a material witness order for Mr. Salcedo.  The purpose of the material witness order was to coerce Mr. Salcedo to revoke his recantation and testify as a prosecution witness.

73.     Mr. Shaban told the trial court that Mr. Salcedo had refused to meet with him and said he would not appear voluntarily.

74.     Mr. Shaban then falsely swore that Mr. Salcedo had failed to comply with a subpoena seeking his attendance.  In fact, Mr. Shaban never had a subpoena served on Mr. Salcedo or even issued a subpoena for him.

75.     That misrepresentation facilitated the Defendants' Hotel Custody practices, because the material witness statute does not authorize an arrest warrant by default.  Only where there is an additional showing of "reasonable cause" to believe the witness would not comply with a court order (or had already disregarded one) does the material witness statute authorize the issuance of a material witness order *and* an arrest warrant.

76.     Without the false representation that Mr. Salcedo failed to comply with a subpoena, Mr. Shaban would have lacked grounds to obtain the arrest warrant.

77.     Based on Mr. Shaban's affirmation, in February 1993, the trial judge, Justice Abraham Gerges of the New York State Supreme Court, Kings County (the "trial court"), granted the application and signed a material witness order and warrant directing that Salcedo be arrested and brought before the trial court forthwith.

78.     Mr. Shaban forwarded the material witness order and warrant to the KCDA's DI squad, a police unit within the KCDA's offices that handles police work and investigative assignments.

79.     On March 11, 1993, DIs Krelik, Lasala, and Salsarulo, and NYPD Detective Buda located Mr. Salcedo and arrested him.

80.     These defendants told Mr. Salcedo that he was required by court order to testify against Mr. Quezada, Detective Buda and one or more of the DIs threatened Mr. Salcedo with

13

jail if he did not testify for the prosecution, and these defendants brought Mr. Salcedo to a hotel near LaGuardia Airport where they unlawfully held him in custody overnight.

81.     Contrary to the trial court's order, these defendants never brought Mr. Salcedo before the court to be arraigned on the material witness warrant, appointed counsel, and provided the hearing required under CPL § 620.50.

82.     Instead, the DI defendants held Mr. Salcedo extrajudicially, consistent with the KCDA's Hotel Custody practices.

83.     The purpose of the threats and unlawful detention were to extort Mr. Salcedo to change his testimony to support the prosecution's case against Mr. Quezada.

84.     The following day, the DI defendants brought Mr. Salcedo to the District Attorney's office, where he was forced to meet with Mr. Shaban.

85.     Mr. Salcedo told Mr. Shaban that he could not testify because he did not actually see who fired the shots on October 19, 1991.

86.     Mr. Shaban replied that Mr. Salcedo had already given a statement identifying Mr. Quezada as the shooter and testified in the grand jury.  Mr. Shaban told Mr. Salcedo that if he went back on his prior statements, he would face prosecution for perjury and/or obstruction of justice.

87.     At the time, Mr. Salcedo was serving a term of supervised release for a federal drug conviction, had an open case being prosecuted by the KCDA (a fact that was never disclosed to the defense at trial), and was not a United States citizen.

88.     Mr. Shaban repeatedly read to Mr. Salcedo the latter's prior recorded statement about the identification of Mr. Quezada.  He told Mr. Salcedo, in no uncertain terms, that he would face dire consequences if he did not stick to that version.

89.     As a result of the defendants' coercion and threats, Mr. Salcedo agreed to repeat his previous accusation that he saw Mr. Quezada shoot Mr. Rosado.

90.     Mr. Salcedo took the stand at Mr. Quezada's criminal trial and testified as the defendants directed him to.

91.     After testifying, Mr. Salcedo was released from custody.

92.     At no time prior to 2011 did the prosecution disclose to the defense that Mr. Salcedo had been arrested, held in custody by the District Attorney's detectives, told that he was required to testify against Mr. Quezada, and threatened with prosecution and jail if he refused to testify as directed by Mr. Shaban.

93.     At no time did the prosecution disclose to the defense that Mr. Salcedo had recanted his identification prior to his testimony at Mr. Quezada's trial.

94.     At no time did the DI defendants or Detective Buda disclose to anyone that they had threatened Mr. Salcedo with jail if he refused to testify for the prosecution.

**<u>False Summation and Conviction</u>**

95.     With no physical or forensic evidence, and the circumstances of Mr. Salcedo's testimony hidden from the defense, the case appeared straightforward, pitting Mr. Salcedo's identification against Mr. Quezada's three alibi witnesses.

96.     In summation, both Mr. Shaban and defense counsel focused their arguments on the issue of witness credibility.

97.     Mr. Shaban repeatedly told the jury that Salcedo was credible and the defense's alibi witnesses were not.

98.     Mr. Shaban emphasized to the jury that Salcedo "came forward" to testify.

99.     Mr. Shaban told the jury that Mr. Salcedo "was not hesitant," and, at one point in his summation, contended that "[o]nly one person" − Salcedo − "came forward to testify in this case."

100.     Mr. Shaban told the jury that when they decided that Mr. Salcedo was credible, they need not even consider the three alibi witnesses who testified for the defense.

101.     The jury found Mr. Quezada guilty of murder in the second degree (depraved indifference murder).

102.     On May 4, 1993, the trial court sentenced Mr. Quezada to imprisonment for 25 years to life.

**Post-Conviction Developments**

103.     Throughout his incarceration, Mr. Quezada maintained his innocence and sought to prove he had been wrongfully convicted.

104.     In or around 2001, Mr. Quezada and his family secured the help of Centurion Ministries, a non-profit organization dedicated to assisting wrongfully convicted persons.

105.     Together with Mr. Quezada's sister Carmen, who lived in the Dominican Republic, Aurora Fernandez, a member of Centurion Ministries, managed to locate Mr. Salcedo in Santo Domingo and spoke to him about the case.

106.     Mr. Salcedo told Ms. Fernandez that he had testified falsely against Mr. Quezada because he had been arrested and threatened with jail if he did not.  Mr. Salcedo agreed to sign an affidavit to that effect.

107.     In the fall of 2001, the KCDA received a copy of an affidavit signed by Mr. Salcedo in the Dominican Republic, in which Mr. Salcedo repudiated his trial testimony that he

saw Mr. Quezada shoot Mr. Rosado in 1991.  In early 2002, prosecutors forwarded that affidavit to Mr. Quezada.

108.    Mr. Salcedo also revealed that he testified at Mr. Quezada's trial only because detectives arrested him, told him he had to testify against Mr. Quezada, threatened him with jail, and held him incommunicado in a hotel until he testified.

109.    Thereafter, Mr. Quezada and his attorney obtained additional affidavits, signed by Mr. Salcedo in the Dominican Republic, in which Mr. Salcedo continued to disavow his trial testimony.

### The First State Post-Conviction Motion

110.    In March 2003, Mr. Quezada filed a motion in the trial court to vacate his state court judgment of conviction under CPL § 440.10 (the "First § 440 Motion").

111.    The KCDA assigned Ms. Wrenn, then a prosecutor in the Appeals Bureau, to handle the case, along with her supervisor, Jane S. Myers, and the trial prosecutor, Mr. Shaban.

112.    Ms. Wrenn filed the prosecution's opposition to the First § 440 Motion, rejecting Mr. Salcedo's allegations and representing that "there is no copy of a material witness order in the file."  "Moreover," Ms. Wrenn told the trial court, neither Mr. Shaban nor Detective Buda had any recollection "that a material witness warrant was either necessary with respect to Salcedo or requested from the Court."

113.    Ms. Wrenn further argued that "[b]ecause Salcedo's alleged claim of police coercion is unfounded, it calls into question the truthfulness of his entire recantation."

114.    Ms. Wrenn later told the trial court that she had gone through the trial folder "paper by paper, piece by piece."

115.    Throughout the post-conviction proceedings from 2003 through 2007, Ms. Wrenn, Ms. Myers, and Mr. Shaban categorically denied Mr. Salcedo's allegations and urged the trial court to reject them.

116.    All three prosecutors were aware of the material witness order and the fact that Mr. Salcedo had been held in Hotel Custody.  At no point during the proceedings did any of the prosecutors disclose those facts to the defense or to the trial court.

117.    During an evidentiary hearing (the "First § 440 Hearing") on the First § 440 Motion, numerous witnesses appeared, including Mr. Salcedo.

118.    Testifying at the hearing, Mr. Salcedo averred, contrary to his testimony at trial, that he never saw who was shooting at the time of Mr. Rosado's murder, but he nevertheless corroborated Mr. Delacruz's account at the insistence of both Mr. Delacruz and police detectives, including Detective Buda.

119.    Mr. Salcedo also testified about the circumstances surrounding his testimony at Mr. Quezada's trial.  Mr. Salcedo testified that detectives arrested him, told him he had to testify against Mr. Quezada at trial, threatened him with jail if he did not testify, and held him incommunicado at a hotel until the completion of his testimony.

120.    Mr. Salcedo gave that testimony in spite of additional threats by Mr. Shaban, who approached Mr. Salcedo before he testified at the hearing and told him, in substance, that if he were to implicate Mr. Shaban in misconduct, there would be consequences.

121.    After Mr. Salcedo testified, Mr. Shaban vigorously cross-examined him, accusing him of fabricating his account of the events surrounding Mr. Quezada's trial.

122.     Mr. Shaban and Ms. Wrenn presented additional evidence, including the testimony of former Detective Buda, calculated to create a false impression that Mr. Salcedo's account of his arrest and confinement in Hotel Custody was untrue.

123.     At the conclusion of the First § 440 Hearing, the prosecution urged the trial court to deny Mr. Quezada's post-conviction motion, arguing that "Salcedo's testimony was utterly incredible" and his claims were "directly contradicted by the credible testimony of Detective Buda who denied every single allegation credibly that Mr. Salcedo made against him."

124.     By order dated July 10, 2007, the trial court denied the First § 440 Motion., finding that the credibility of Mr. Salcedo's recantation was "undermined by the accusations of gross misconduct on the part of Detective Buda."  The trial court explained that Mr. Salcedo's allegations of being arrested and held in a hotel until he agreed to testify were "highly improbable" in light of Detective Buda's testimony.

**The Case Moves to Federal Court;**
**The Material Witness Order Is Finally Uncovered**

125.     After unsuccessfully appealing from the denial of the First § 440 Motion, in late 2008 Mr. Quezada filed a petition for a writ of habeas corpus in the U.S. District Court for the Eastern District of New York, before Judge Kiyo A. Matsumoto.

126.     In early 2010, Judge Matsumoto appointed *pro bono* counsel for Mr. Quezada.

127.     Because Mr. Quezada had previously filed a habeas petition that was dismissed for procedural reasons, 28 U.S.C. § 2244 required Mr. Quezada to obtain authorization from the U.S. Court of Appeals for the Second Circuit before pursuing a second petition.  Judge Matsumoto transferred the case to the Second Circuit to permit Mr. Quezada's new attorneys to make that application.

128.    On October 21, 2010, the Second Circuit granted Mr. Quezada's motion for leave to file a second habeas petition, finding that Mr. Quezada had made a *prima facie* showing "by clear and convincing evidence that but for [constitutional] error no reasonable jury would have found him guilty." *Quezada v. Smith*, 624 F.3d 514 (2d Cir. 2010).  That decision, the Second Circuit's first published decision authorizing a "second or successive" habeas petition since the enactment of AEDPA in 1996, was issued before the material witness order had even been revealed.

129.    Mr. Quezada returned to the district court, where his lawyers filed a discovery motion.  As a result of that motion, in early 2011, Mr. Quezada learned, for the first time, that the KCDA's records confirmed that Mr. Salcedo had been arrested on a material witness order and held in Hotel Custody until he testified at Mr. Quezada's trial.

130.    Ms. Wrenn produced a copy of the material witness order and falsely represented to the court that it had just been "discovered" in the prosecution's files and she was previously unaware of its existence.

131.    The parties spent the next few years in federal discovery.  During that process, Ms. Wrenn vigorously opposed any electronic discovery, falsely stating that a search of the KCDA's email data was virtually impossible.  That was a prescient untruth, given what would later be discovered in Ms. Wrenn's emails.

132.    In July 2013, Ms. Wrenn testified in a deposition in the § 1983 wrongful conviction lawsuit of Jabbar Collins.  Mr. Collins' case, like this one, involved the improper coercion of unwilling witnesses through material witness orders and other legal process, and the suppression of *Brady* information, including the methods used to force witnesses to "cooperate." *See generally Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013).

133.     In that deposition, Ms. Wrenn testified, falsely, that she was never aware of a material witness order for Mr. Salcedo until 2011 – years after the conclusion of proceedings on Mr. Quezada's First § 440 Motion.

## The Second State Post-Conviction Motion

134.     Based on the new evidence uncovered in the federal habeas proceedings, in 2014, the parties returned to state court.  Judge Matsumoto held the habeas petition in abeyance while Mr. Quezada's lawyers filed a second motion to vacate the judgment of conviction under Section 440.10 of the Criminal Procedure Law (the "Second § 440 Motion").

135.     The Second § 440 Motion was assigned to Justice Ruth Shillingford, who held an evidentiary hearing on the motion beginning in early 2015.

136.     Ms. Wrenn appeared as counsel for the KCDA, and both she and Mr. Shaban testified for the prosecution.

137.     Both Ms. Wrenn and Mr. Shaban claimed that they had no knowledge of a material witness order for Mr. Salcedo at any time during the pendency of the First § 440 Motion.

138.     After the hearing concluded, the parties continued litigating various issues involving the prosecution's failure to disclose relevant documents and information to the defense.

139.     After the prosecution repeatedly failed to disclose documents as required by law, Justice Shillingford barred Ms. Wrenn from further participation in the post-conviction proceedings and all files were removed from Ms. Wrenn's office.

140.    In response to the pattern of disclosure shortfalls, Mr. Quezada's lawyers requested a search of the prosecution's emails.  In August 2015, the KCDA began reviewing email data from the time of the first post-conviction motion.

141.    On August 28, 2015, the prosecution disclosed to Mr. Quezada's attorneys a 2004 email Ms. Wrenn sent to her supervisor, Jane S. Myers, during the First § 440 Hearing, discussing the material witness order for Mr. Salcedo.

142.    The email made it clear that KCDA prosecutors had deliberately lied about the material witness order for more than ten years of post-conviction proceedings.

143.    The KCDA immediately fired Ms. Wrenn and agreed to vacate Mr. Quezada's conviction and dismiss all charges against him.

144.    On August 31, 2015, Justice Shillingford granted Mr. Quezada's motion to vacate his judgment of conviction, on consent, and dismissed the indictment against Mr. Quezada.

145.    Justice Shillingford informed the KCDA that she expected the Office to take "appropriate steps" to address Ms. Wrenn's testimony in the cases of Mr. Quezada and Jabbar Collins.

146.    Mr. Quezada was released that day, after nearly 24 years in custody.

## DAMAGES

147.    From March 15, 1993 to August 31, 2015, Mr. Quezada was imprisoned as a result of his unjust conviction.

148.    Mr. Quezada's unjust conviction and imprisonment caused him mental, psychological, and emotional suffering, and permanent mental, psychological, and emotional harm, including anxiety, sleep disorders, depression, and post-traumatic stress.

149.    Mr. Quezada's unjust conviction and imprisonment caused him to suffer physical

injury and illness, including injuries suffered due to physical assaults by other inmates (including permanent disfigurement), hypertension, and headaches.

150.    Mr. Quezada's unjust conviction and imprisonment caused him the loss of his relationships with his children, parents, other relatives, and then-fiancée.

151.    During Mr. Quezada's unjust imprisonment, his mother passed away and Mr. Quezada was unable to attend the funeral.

152.    Mr. Quezada's unjust conviction and imprisonment caused him to lose the income he otherwise would have received during the time he was incarcerated, as well as educational, employment, and advancement opportunities.

153.    Mr. Quezada's unjust conviction and imprisonment have caused a permanent diminution of his earning capacity.

154.    Mr. Quezada's unjust conviction and imprisonment caused him to incur legal and medical fees and expenses.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

*Denial of Due Process and Right to a Fair Trial, Fabrication of Evidence, and Suppression of* Brady *Information (United States Constitution Amendments V, VI, and XIV)*

**Against Defendants Buda, Krelik, Lasala, and Salsarulo**

155.    Mr. Quezada repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

156.    Defendants Buda, Krelik, Lasala, and Salsarulo knowingly and intentionally manufactured, caused the manufacturing of, and/or failed to intervene in the manufacturing of false and/or misleading evidence by coercing Mr. Salcedo to give inculpatory testimony against

Mr. Quezada through threats, intimidation, and unlawful arrest and imprisonment.

157.    Defendants knew, intended, and/or were deliberately indifferent to the fact that the false and/or misleading evidence would deprive Mr. Quezada of a fair trial and result in his wrongful conviction and incarceration.

158.    Defendants knew and intended that *Brady* information – including their threats and unlawful arrest and imprisonment of Mr. Salcedo – would be concealed from Mr. Quezada and his attorney.

159.    Defendants caused said *Brady* information to be concealed from Mr. Quezada and his attorney by failing to disclose it, conspiring to suppress it, and inducing Mr. Salcedo and others not to disclose it.  The damage of that nondisclosure was later compounded by Mr. Shaban's own *Brady* violations, which are distinct from the *Brady* violations alleged herein.

160.    Defendants' conduct, committed in concert with one another and/or others, deprived Mr. Quezada of his rights under the United States Constitution: (a) not to be prosecuted, convicted, or imprisoned based on false, fabricated, manufactured, or misleading "evidence," including the testimony of Mr. Salcedo who was improperly influenced, coerced, and/or manipulated to give false testimony, and whose testimony defendants knew was false, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and (b) to timely disclosure of material evidence favorable to the defense under *Brady*, as defined in note 1, *supra*, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

161.    Defendants' acts and omissions proximately caused the continuation of Mr. Quezada's criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

162.    Defendants committed the foregoing violations, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Mr. Quezada's constitutional rights.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

### Against Defendant City of New York and Hynes (Official Capacity)

163.    Mr. Quezada repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

164.    At the time of Mr. Quezada's prosecution, and continuing through the time his case was dismissed and he was released from custody, former DA Hynes, as the manager, chief administrator and policymaker of the KCDA, a City agency, created and/or maintained policies, customs, and/or practices of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn, including through (a) manufacturing false and/or misleading evidence and testimony through improper coercion of witnesses; (b) knowingly presenting false testimony and arguments at criminal proceedings; (c) suppressing *Brady* information; (d) unlawfully arresting, imprisoning, and coercing witnesses; (e) abusing material witness orders, subpoenas, "*Damiani*" orders,[7] and other court process; and (f) covering up these unlawful practices.

165.    These policies, customs, and practices have led the Second Circuit and numerous courts within this District to recognize analogous Section 1983 *Monell* claims brought by other wrongfully convicted persons.  *See, e.g.*, *Walker v. City of New York,* 974 F.2d 293, 300-01 (2d Cir. 1992) (reversing district court's dismissal of *Monell* claim based on KCDA's

---

7.  "*Damiani*" orders refer to a procedure established by court order in 1972 whereby the District Attorney could demand the production of an inmate to be released into the custody of DA investigators and later returned to the Department of Correction.  *See People v. Jackson*, 480 N.E.2d 727, 728 n.1 (N.Y. 1985).

deliberate indifference, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 441-43 (E.D.N.Y 2015) (denying City's summary judgment motion on *Monell* claim based on KCDA's deliberate indifference, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Collins*, 923 F. Supp. 2d at 477 (denying City's motion to dismiss *Monell* claim based on KCDA's deliberate indifference, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights, including failure to disclose information concerning a material witness orders and other court process).

166.    These policies, customs, and practices persisted from Former DA Hynes' induction as District Attorney in 1990 through (and, in certain respects, beyond) the end of his tenure as District Attorney in 2013.

167.    Former DA Hynes, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the District Attorney's Office, particularly in homicide cases and other cases where arrest and conviction were most desired by the Office.

168.    These policies, customs, and practices proximately caused the violations of Mr. Quezada's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

169.    Former DA Hynes' policy and practice was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligations to make timely disclosure to the defense of *Brady* information.  Former DA Hynes' deliberate indifference to such violations

created an "anything goes" atmosphere that caused such violations to continue, including in Mr.

Quezada's case.

170.    Under Former DA Hynes' office-wide policies, customs, and practices,

prosecutors and investigators were permitted and encouraged to use illegal tactics to coerce

witnesses to testify in the manner prosecutors desired, including by:

(a)    lying to courts about their need for and entitlement to material witness arrest warrants, and thereby obtaining authorization to arrest witnesses the KCDA viewed as uncooperative;

(b)    abusing material witness orders by failing to bring witnesses directly before the court for appointment of counsel and a judicial hearing (as material witness orders require), and instead implementing the KCDA's Hotel Custody Program: kidnaping witnesses and holding them either in the DA's office or in a hotel room, where they would threaten, intimidate, or cajole them into becoming what prosecutors considered cooperative, and keeping the witnesses in the KCDA's custody until they testified for the prosecution;

(c)    issuing and executing improper "office" subpoenas to compel witnesses to attend interviews at their office, despite numerous judicial decisions making clear that such process was unlawful;

(d)    misleading courts to issue orders (including "*Damiani*" orders and orders to produce) allowing them to take custody of incarcerated witnesses, in many cases without their counsel and/or against their will, and bring them to the DA's office where KCDA employees would threaten, intimidate, or cajole the witnesses into becoming what prosecutors considered cooperative;

(e)    causing the New York State Division of Parole and the State Department of Corrections to illegally revoke the release of prisoners so that prosecutors could gain custody of them and threaten them with indefinite imprisonment unless they "cooperated" by testifying favorably for the prosecution; and

(f)    coercing witnesses who have been arrested on unrelated charges to "cooperate" by exploiting their drug withdrawal and dependency, holding them prisoner in remote locations while threatening to interrogate them indefinitely, and threatening harsh prosecution and imprisonment while simultaneously holding out the inducements of leniency and monetary reward.

171.    Under Former DA Hynes' office-wide policies, customs, and practices,

prosecutors and investigators were permitted and encouraged to refrain from making any record

of *Brady* information concerning prospective prosecution witnesses to avoid disclosing information favorable to the defense, despite the fact that disclosure of such information was and is constitutionally required regardless of whether the information were recorded in written form.

172.    Former DA Hynes' training and discipline policies and practices were likewise consciously designed to permit and encourage *Brady* violations.

173.    Prosecutors and investigators were trained on avoiding the creation of *Brady* and *Rosario* material, instructed not to disclose *Brady* information if they could rationalize non-disclosure by subjectively assessing the information as "unreliable" or "incredible," and encouraged to cover up *Brady* information kept hidden by other members of the District Attorney's Office.

174.    Prosecutors were permitted and encouraged not to comply with the Office's ongoing *Brady* obligations after trial; to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and/or through FOIL requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the District Attorney's Office and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

175.    Prosecutors, in violation of *Brady*, were permitted and/or encouraged to refrain from disclosing material witness applications, orders, and proceedings; relocation assistance promised or provided to witnesses; and other pressure tactics, promises, and rewards used to influence witnesses.

176.    Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings,

or otherwise), former DA Hynes encouraged such violations by demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements.  To the contrary, prosecutors who violated defendants' due process rights were promoted, praised, given pay raises, and otherwise endorsed by former DA Hynes and his Office.

177.   Former DA Hynes had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for *Brady* or other constitutional violations by prosecutors or investigators.  In fact, there was no such process or penalties.

178.   Despite dozens of court decisions finding that prosecutors had wrongfully failed to disclose information as required under *Brady*, *Rosario*, or state discovery laws, or otherwise had engaged in conduct that misled courts, juries, defendants, and/or defense attorneys, none of the prosecutors involved was disciplined.

179.   Stunningly, not once during his 24 years in office did former DA Hynes terminate a KCDA prosecutor for prosecutorial misconduct.

180.   Since former DA Hynes took office in 1990, only one KCDA prosecutor has been terminated for prosecutorial misconduct: that is Ms. Wrenn, who was terminated by former DA Hynes' successor, former DA Thompson, for the misconduct she committed in this case.

### Former DA Hynes Had Ample Notice of the Prosecutorial and Investigative Misconduct Occurring in His Office

181.   Examples of the decisions that put former DA Hynes on notice, before Mr. Quezada's conviction, of the unlawful conduct being committed by his prosecutors and investigators include *Walker,* 974 F. 2d 293 (Second Circuit upheld *Monell* claim against City of New York for unlawful policies of Brooklyn District Attorney's Office that allegedly resulted in withholding of *Brady* material causing plaintiff s wrongful conviction and 18-year

imprisonment); *People v. Vilardi*, 542 N.Y.S.2d 238 (2d Dep't 1989) (vacating conviction based on prosecutor's failure to turn over exculpatory police report); *People v. Lugo*, 544 N.Y.S.2d 985 (2d Dep't 1989) (granting motion to vacate conviction based on *Brady* and *Rosario* violations, holding that *Rosario* violation clearly undermined conviction, rendering further *Brady* analysis unnecessary); *People v. Lyking*, 537 N.Y.S.2d 314 (2d Dep't 1989) (prosecutor's improper summation deprived defendant of a fair trial and required reversal of conviction); *People v. Rayford*, 158 A.D.2d 482 (2d Dep't 1990) (prosecutor suppressed exculpatory information concerning use of suggestive identification procedures); *People v. Nedrick,* 166 A.D.2d 725 (2d Dep't 1990) (prosecutor failed to disclose tape-recorded impeachment material); *People v. Anderson,* 160 A.D.2d 806 (2d Dep't 1990) (prosecutor failed to timely disclose impeachment material); *People v. Brazzeal*, 172 A.D.2d 757 (2d Dep't 1991) (prosecutor's improper summation violated defendant's due process rights); *People v. Faison,* 176 A.D.2d 752 (2d Dep't 1991) (prosecutor failed to timely disclose witness' prior statement); *People v. Crespo,* 188 A.D.2d 483 (2d Dep't 1992) (mistrial granted due to prosecutor's *Brady* violation); *People v. Brown,* 187 A.D.2d 437 (2d Dep't 1992) (trial court sanctioned prosecutor for *Brady* violation); *People v. Cecora,* 186 A.D.2d 215 (2d Dep't 1992) (prosecution and police failed to disclose interview notes containing potential impeachment information); *People v. Hughes,* 181 A.D.2d 132 (2d Dep't 1992) (hearing required regarding prosecution's failure to disclose exculpatory police report); *People v. Inswood,* 180 A.D.2d 649 (2d Dep't 1992) (prosecution's failure to turn over *Brady* material was error; assigned prosecutor is subsequently promoted, does not receive negative feedback or personnel action); *People v. Lebron*, 585 N.Y.S.2d 498 (2d Dep't 1992) (prosecution's presentation of false testimony that was "completely unbelievable and untrustworthy" required reversal of conviction);

*People v. Jackson,* 198 A.D.2d 301 (2d Dep't 1993), *affirming* 154 Misc. 2d 718 (Sup. Ct. Kings Cty. 1992) (prosecutors failed to timely disclose exculpatory statements; conviction reversed); *People v. Gurley*, 602 N.Y.S.2d 184 (2d Dep't 1993) (affirming trial court's grant of post-conviction motion arising from KCDA's suppression of *Brady* information); *People v. Stevens,* 199 A.D.2d 441 (2d Dep't 1993) (*Brady* and *Rosario* material improperly withheld; prejudice not sufficient to require reversal); *People v. Cortez,* 149 Misc. 2d 886 (Sup. Ct. Kings Cty. 1990) (prosecutors and police violated *Brady* and court order by intentionally destroying tape containing impeachment material); *People v. Young,* 155 Misc. 2d 878 (Sup. Ct. Kings Cty. 1992), *on remand from,* 79 N.Y. 2d 365 (1992) (failure to disclose impeachment material required new trial; hearing court condemned prosecution for tailoring testimony); *People v. Giddings,* 2/21/92 NYLJ 25 (col. l) (Sup. Ct. Kings Cty. Feb. 21, 1992) (prosecutor's failure to disclose witness' prior inconsistent statements required conviction to be vacated).

### Examples of the KCDA's Unlawful Policies, Practices, and Customs

182.    Examples of former DA Hynes' ongoing policies and practices, of encouraging, authorizing, and/or permitting misconduct by his prosecutors and investigators,[8] include *Leka v. Portuondo,* 257 F.3d 89 (2d Cir. 2001) (conviction overturned on habeas review due to prosecution's suppression of *Brady* material; prosecutor also misled defense counsel regarding a crucial witness); *Boyette v. LeFevre,* 246 F.3d 78 (2d Cir. 2001) (conviction vacated on habeas review because prosecutors suppressed *Brady* material); *Waston v. Greene,* 2009 WL 5172874 (E.D.N.Y. Dec. 30, 2009) (prosecutors disclosed *Brady* material

---

8.    *See, e.g., Collins,* 923 F. Supp. 2d at 477 (*citing Bordanaro v. McLeod,* 871 F.2d 1151, 1167 (1st Cir.1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *Henry v. County of Shasta,* 132 F.3d 512, 519 (9th Cir.1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.")).

"too late" for the defense to make use of it even though they were aware of material "more than a year in advance of trial"); *People v. Scott,* 88 N.Y. 2d 888 (N.Y. 1996) (prosecution failed to disclose statement regarding polygraph result); *People v. Bond,* 95 N.Y. 2d 840 (N.Y. 2000) (myriad *Brady* violations established at Criminal Procedure Law Section 440.10 hearing, including failure to disclose material witness proceeding concerning principal witness; conviction reversed due to prosecution's failure to disclose prior unrecorded statements to police by prosecution's main witness that she did not see the shooting about which she testified as an "eyewitness"); *People v. Calabria,* 94 N.Y.2d 519 (N.Y. 2000) (prosecutor repeatedly defied court's ruling and made false or misleading argument to jury); *People v. Jenkins,* 98 N.Y. 2d 280, 287-88 (N.Y. 2002) (Kaye, C.J., dissenting) (prosecutor's late disclosure of ballistics report "blind sided" the defense and was inexcusable); *People v. Fuentes,* 12 N.Y. 3d 259 (N.Y. 2010) (prosecutor improperly withheld portion of medical records containing potentially favorable evidence for the defense; two judges find the suppression was "deliberate"); *People v. Khadaidi,* 201 A.D.2d 585 (2d Dep't 1994) (conviction reversed for prosecution's failure to disclose interview notes with complainant containing prior inconsistent statement); *People v. Alvarado,* 201 A.D.2d 486 (2d Dep't 1994) (prosecution failed to disclose police reports containing impeachment material; conviction reversed); *People v. Barnes,* 200 A.D.2d 751 (2d Dep't 1994) (prosecutor did not record and did not disclose eyewitness' recantation; conviction not reversed because eyewitness ultimately recanted on the witness stand and was adequately cross-examined); *People v. Bramble,* 207 A.D.2d 407 (2d Dep't 1994) (sanctions upheld for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request); *People v. Roberts,* 203 A.D.2d 600 (2d Dep't 1994) (prosecution delayed one year

in disclosing exculpatory witness statement, by which time witness was unavailable; conviction reversed); *People v. Neptune,* 161 Misc. 2d 781 (Sup. Ct. Kings Cty. 1994) (prosecution acted unethically by improperly using invalid subpoena to cause a witness to appear for an interview at the District Attorney's office); *People v. Scott,* 216 A.D.2d 592 (2d Dep't 1995) (prosecutor suppressed reports, including polygraph results indicating key witness was withholding information); *People v. Rahman,* 231 A.D.2d 745 (2d Dep't 1996) (matter remitted for hearing concerning prosecution's apparent improper withholding of witness' cooperation agreement); *People v. Perkins,* 227 A.D.2d 572 (2d Dep't 1996) (prosecutor failed to disclose cooperation agreement with witness); *People v. Callendar,* 227 A.D.2d 499 (2d Dep't 1996) (conviction reversed due to prosecutor's failure to turn over notes of detective's prior statement); *People v. Bruce,* 224 A.D.2d 438 (2d Dep't 1996) (conviction reversed for prosecutor's failure to produce police reports containing impeachment material); *People v. Dupont,* Kings County Ind. No. 6287/97 (prosecutor made misrepresentation by claiming District Attorney's Office did not possess physical evidence specifically requested by the defense); *People v. LaSalle,* 243 A.D.2d 490 (2d Dep't 1997) (conviction reversed due to prosecutor's "blatant misrepresentation of the facts" during summation); *People v. Gourgue,* 239 A.D.2d 357 (2d Dep't 1997) (prosecutor put notes of complainant's statements in the form of questions to "circumvent" disclosure obligation; conviction reversed); *People v. Hill,* 244 A.D.2d 572 (2d Dep't 1997) (prosecutor sanctioned for failing to disclose 911 tape); *People v. Gramby,* 251 A.D. 3d 346 (2d Dep't 1998) (prosecutor suppressed and failed to timely disclose 911 tape); *People v. Campbell,* 269 A.D.2d 460 (2d Dep't 2000) (prosecutor's suppression of *Rosario* material, a tape-recorded statement by the complainant, required reversal of conviction); *People v. Maddery,* 282 A.D.2d 761 (2d Dep't 2001)

(prosecutor's failure to disclose 911 tape before trial as required by law required reversal of conviction); *People v. King,* 298 A.D.2d 530 (2d Dep't 2002) (prosecutor's failure to disclose 911 tape before trial as required by law required conviction to be reversed); *People v. Vielman,* 31 A.D. 3d 674 (2d Dep't 2006) (reversing conviction because prosecutor's summation rested on a "false premise" and was a "blatant attempt to mislead the jury"); *People v. Jones,* 31 A.D. 3d 666 (2d Dep't 2006) (prosecution fails to correct the false testimony of a key witness); *People v. Thompson,* 54 A.D. 3d 975 (2d Dep't 2008) (prosecutor suppressed *Brady* material indicating someone other than the defendant committed the crime); *People v. Ramos,* 166 Misc. 2d 515 (Sup. Ct. Kings Cty. 1995) (due to District Attorney's Office policy of not taking notes of witness interviews, trial prosecutor was not aware of information acquired by previously assigned prosecutors for which court had ordered disclosure; conviction vacated on due process grounds); *People v. Green,* 10/19/99 N.Y.L.J. p. 30, col. 1 (Sup. Ct. Kings Cty., Oct. 19, 1999) (prosecution failed to disclose *Brady* material); *People v. Davis,* 709 N.Y.S. 2d 345 (Sup. Ct. Kings Cty. 2000) (prosecution violated court's order to disclose exculpatory evidence to defense before indictment; indictment dismissed); *People v. Cannon,* 191 Misc. 2d 136 (Sup. Ct. Kings Cty. 2002) (prosecution responsible for failure to preserve surveillance photographs); *People v. Malik,* 25 Misc. 3d 1214(A) (Sup. Ct. Kings County 2009) (prosecution's suppression of police report and other documents required vacatur of conviction).

183.    Under Former DA Hynes' policies, customs, and practices, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

184.    Even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible.  No prosecutor was

ever reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

185.    To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, Former DA Hynes stubbornly defended the propriety of his employees' behavior, thereby ratifying and signaling his tolerance of it.  Personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions – sometimes within weeks or even days of court decisions identifying the misconduct.

186.    One prominent example of this is former Homicide Bureau Chief Michael Vecchione, a discredited former prosecutor and member of former DA Hynes' inner circle. Despite a litany of misconduct by former ADA Vecchione, some of which has been widely reported in the press and much of which is detailed in the complaint from Jabbar Collins' Section 1983 lawsuit (attached as Exhibit A and incorporated by reference herein), former DA Hynes unflinchingly defended former ADA Vecchione; never disciplined or otherwise rebuked him; consistently gave him raises, bonuses, promotions and awards; and held him up to others in the KCDA as an example of what former DA Hynes wanted his prosecutors to be.

187.    High-level KCDA officials have acknowledged in deposition testimony that there was no formal disciplinary procedure or policy for prosecutorial or investigator misconduct committed by KCDA employees, and they were unaware of any prosecutor or investigator ever being disciplined during former DA Hynes' tenure for unconstitutional conduct committed during a criminal investigation or prosecution.  In fact, no discipline had been imposed on any of the prosecutors or investigators involved in cases of proven misconduct.

188.    Former DA Hynes' office likewise had no formal policy requiring disclosure of *Brady* information or any written policy on how to disclose it.

189.    Former DA Hynes' office provided no training on how to question or evaluate informant or accomplice witnesses.

190.    One high-ranking official testified that, despite having virtually daily contact with former DA Hynes over many years, he never heard former DA Hynes discuss the training of prosecutors in such areas.

191.    Even after judgments were entered against KCDA-affiliated individual capacity defendants in various civil rights lawsuits alleging prosecutorial and investigative misconduct, former DA Hynes' office conducted no investigation and imposed no discipline on any of the employees involved.

192.    A number of cases handled by former DA Hynes' office evidence the above policies and practices of encouraging and tolerating misconduct by KCDA staff.

**The Rodney Russ Case**

193.    Early in his tenure, former DA Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder conviction obtained in *People v. Russ*, 79 N.Y.2d 173 (N.Y. 1992), a case where the KCDA secured a murder conviction by arresting and threatening a 17 year-old witness with prosecution and imprisonment until she agreed to testify against the defendant.  In reversing that conviction, the New York Court of Appeals condemned the "egregious" behavior of the KCDA in "'legally' coerc[ing] testimony."  *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience"). The court wrote that such conduct prejudiced defendants, victimized witnesses, and undermined the integrity of the criminal justice process.

194.    No training or disciplinary action was taken to remedy the misconduct exposed in the *Russ* case.

195.     Shortly after the *Russ* decision came the misconduct committed in Mr. Quezada's case, described above.

### The Jabbar Collins Case

196.     Other examples of the KCDA's practice of improperly coercing false testimony and former DA Hynes' endorsement of that practice include the case of Jabbar Collins, where, as in Mr. Quezada's case, the prosecution's key witnesses were secretly arrested and threatened with imprisonment if they did not testify for the prosecution.

197.     As in Mr. Quezada's case, the lead prosecutor in Mr. Collins' criminal trial, Mr. Vecchione, falsely represented to the jury that his key witness, Edwin Oliva, had no incentive to testify for the prosecution other than to tell the truth.  In fact, Mr. Oliva had been pressured to testify by KCDA DIs and Mr. Vecchione himself, and offered leniency in his ongoing criminal matters.

198.     Mr. Vecchione suppressed a variety of *Brady* information, including a pre-trial recantation by Mr. Oliva, and the abuse of material witness orders to coerce testimony from two additional witnesses, Angel Santos and Adrian Diaz.

199.     Former DA Hynes vigorously defended the *Collins* conviction, as he did with Mr. Quezada's, including after both the suppression of *Brady* information and improper coercion of witnesses through material witness orders were brought to light, and approved of the conduct of his prosecutors and investigators in those cases.

200.     Even after two federal judges characterized the KCDA's conduct in the *Collins* case as "shameful" and a "disgrace," former DA Hynes defended Mr. Vecchione and took no action against him.

201.     Discovery in Mr. Collins § 1983 lawsuit yielded a host of evidence of the

KCDA's unlawful policies, practices, and customs concerning the unlawful detention and coercion of prospective witnesses, including the testimony of former DA Hynes, Mr. Vecchione, former Chief Assistant DA Amy Feinstein, KCDA Homicide Bureau Chief Kenneth Taub, Homicide Bureau paralegal Liz Noonan, and former Supervising DI Stephen Bondor.  Those witnesses confirmed that the KCDA's Hotel Custody program was routine for homicide prosecutors in the 1990s.

### The Tasker Spruill Case

202.    In the 1998 trial of Tasker Spruill, KCDA prosecutors and investigators repeatedly abused "*Damiani*" orders to coerce prosecution witness Shawn Newton to testify against the defendant, including by: filing applications containing false information; taking custody of Mr. Newton against his will; and repeatedly shipping Mr. Newton back and forth between court and prison (a practice known as "bullpen therapy") – tactics that drove Mr. Newton to attempt suicide in prison.

203.    Witness testimony in the currently-ongoing state court post-conviction hearing in Mr. Spruill's case provides additional evidence that the abuse of court process and coercion of unwilling witnesses was standard operating procedure in the KCDA under former DA Hynes.

204.    As in Mr. Quezada's case, KCDA prosecutors spent years suppressing *Brady* information, including by consistently rejecting Mr. Spruill's allegations that Mr. Newton had been an unwilling witness and was subjected to extreme pressure to obtain his supposed "cooperation."

205.    In that case too, after years of litigation, Mr. Spruill's attorneys uncovered documents proving the coercive tactics used, and demonstrating that the KCDA had long withheld *Brady* information and misrepresented the information in its files.

**The Bensale Neptune Case**

206.    Shortly after the misconduct committed during Mr. Quezada's trial, the same trial

judge, Abraham Gerges, recognized and denounced the KCDA's practice of misusing the court's

subpoena power to coerce witnesses.  In a decision published July 7, 1994, in another murder

case being prosecuted by the Homicide Bureau under its then-Bureau Chief, former ADA

Vecchione, Justice Gerges condemned a homicide ADA for serving a subpoena on a witness on a

day there would be no testimony "in the hope that it would coerce the witness into consenting to

be interviewed prior to testifying."  Justice Gerges denounced the "unprofessional conduct"

under numerous prior court decisions outlawing the practice, and admonished the KCDA that the

"practice should not be replicated."  *People v. Neptune*, 161 Misc. 2d 781, 785; 615 N.Y.S.2d

265, 267 (Sup. Ct. Kings Cty. July 7, 1994) (citations and quotations omitted).[9]

**The Brian Bond Case**

207.    Those abusive practices continued, however.  In another murder case prosecuted

by former ADA Vecchione's bureau, *People v. Brian Bond*, Ind. No. 13991/91, the assigned

ADA defied Justice Gerges and the decisions of the Court of Appeals and the Appellate Division

upon which his decision had been based.  Former ADA Stan Irvin and DIs working under his

direction illegally subpoenaed all prospective witnesses to their office to coerce them to submit

to office interviews before testifying at the trial. Without disclosing to the court the impropriety

of his subpoenas, Irvin then obtained material witness orders authorizing the arrest of any

witness who failed to comply with the subpoenas.

208.    One witness, a crack addict named Carmen Green, had told police detectives and

---

9.  Like Mr. Quezada and his trial counsel, the evidence shows that Justice Gerges was kept in the dark about
the KCDA's unlawful arrest and imprisonment of Mr. Salcedo.  Had Justice Gerges known the prosecution
had abused a material witness order he signed in the same manner as prosecutors abused the subpoena in
the *Neptune* case, he would not have tolerated it.  A material witness order is a far more powerful and
coercive mechanism than a subpoena, the KCDA's abuse of which Justice Gerges sharply repudiated.

KCDA DIs that she had not seen the incident in question at all. When DIs found her, they noted that she was too "impaired" to comply with the subpoena.  They knew as well that she was under investigation (and feared that she and her children would be arrested) for dealing drugs out of her apartment.  Obtaining a material witness warrant authorizing Ms. Green to be taken "forthwith" to court, where an attorney would be appointed for her, former ADA Irvin instead had her brought to his office, where he and the detectives threatened her with incarceration and interrogated her on and off for eight hours.  Only after the witness submitted to their custody did the ADA and DIs finally bring her to court, after midnight, so that a judge could sign an order ratifying what was misrepresented as her "consent" to be detained until the conclusion of her testimony.

209.    The prosecutor, former ADA Irvin, then violated *Brady* by not disclosing to the defense Ms. Green's prior statements denying having seen the shooting, her eight-hour unlawful interrogation, her evident drug impairment, the threats made to arrest her and her family, and promises to relocate her at public expense. Nor did he disclose the statements of her other family members that she was not present during the shooting, or that they, too, had been promised, and did receive, relocation assistance.  Mr. Bond was convicted of murder.

210.    During an evidentiary hearing held in 1998 concerning Mr. Bond's subsequent motion to vacate his conviction due to *Brady* and related constitutional violations, an unapologetic then-ADA Irvin testified that it was the Office's regular practice to pick up witnesses on material witness warrants and, instead of bringing them directly to court "forthwith" as such warrants direct, to forcibly take them for interrogation to the DA's Office.

211.    In 2000, the New York Court of Appeals vacated Mr. Bond's conviction due to the Office's failure to disclose Ms. Green's statements denying having seen the homicide. The

KCDA's Appeals Bureau had argued, on behalf of then-DA Hynes, that it had no obligation to disclose statements that, in its view, were "untrue."

### The Zaher Zahrey Case

212.    In August and September 1994, during the KCDA's investigation of an NYPD detective, Zaher Zahrey, on corruption allegations, detectives working under the supervision of KCDA prosecutors obtained court orders to produce a prospective witness, Sidney Quick, who was a crack addict and a career criminal, for interviews on the condition that his attorney would be present, but then, with the prosecutor's approval, interrogated him without notifying his attorney.

213.    In March, 1995, after Mr. Quick had been sent upstate to serve his sentence, detectives, with the prosecutor's approval, again met with Mr. Quick without his attorney, and, through a combination of coercion and promises of expedited release, caused him to adopt a story they suggested to him, implicating the target of their investigation, which they knew from other evidence was false.  They tape recorded this meeting and gave the tape to the prosecutor, who listened to it, heard the coercion and improper promises, and heard the encouragement of Mr. Quick to adopt a false story.  Rather than condemn the detectives' tactics, however, the prosecutor told them that Mr. Quick's statements were "promising."

214.    In or about January 1996, detectives working directly under KCDA prosecutors' supervision arrested several other individuals in the hope of turning them into prosecution witnesses, took them to remote locations instead of to court, and illegally interrogated them in violation of their rights to counsel and prompt arraignment.

215.    Because none of Mr. Quick's false story could be corroborated, which is a prerequisite for prosecution under New York law, KCDA prosecutors obtained former DA

Hynes' approval to recommend the case to federal authorities for prosecution.  In doing so, however, former DA Hynes' prosecutors did not disclose to the federal authorities the tape, the improper interrogation tactics used with Mr. Quick, or numerous of Mr. Quick's prior inconsistent statements.  When Mr. Quick inadvertently disclosed to the federal prosecutor that he had been taped, KCDA employees delayed disclosing the tape for several weeks to ensure that the federal authorities went ahead with the high-profile indictment and publicly committed themselves to the case.  Mr. Zahrey ultimately was acquitted, but not until he had spent nearly nine months in pretrial confinement.

### The Sarni Leka Case

216.    Former DA Hynes likewise ratified his employees' misconduct of the 1990 Sarni Leka murder prosecution. Shortly after the 1990 conviction, Mr. Leka moved to vacate his conviction because the prosecution intentionally suppressed a variety of *Brady* information.  Not only did the KDCA vigorously oppose the defendant's motion and appeal, but former DA Hynes wrote that he had "personally reviewed the facts and circumstances" of the case and "Mr. Leka's due process right as a defendant were amply and ably protected."  Years later, however, the U.S. Court of Appeals for the Second Circuit vacated Mr. Leka's conviction, finding that the KCDA had actively "suppressed" exculpatory evidence, decrying one of its arguments as "ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial.  *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001).  With the only two identifications witnesses having recanted their testimony, the KCDA was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison.

217.    No training or disciplinary action was taken to remedy the misconduct exposed in

the *Leka* case.

### The KCDA's Unconstitutional Policies Caused Mr. Quezada's Conviction

218.    The violations of Mr. Quezada's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to former DA Hynes in his official capacity and, by extension, the City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Quezada, subject to investigation and prosecution by the KCDA, including:

(a)  The institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

   i.  the duty not to use false or misleading evidence, testimony, and arguments during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

   ii.  the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

   iii.  the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

(b)  the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

219.    The foregoing express and/or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City, including, but not limited to, former DA Hynes and his delegates, who knew that such policies, procedures,

regulations, practices, and customs implicated issues that regularly arise in the investigation and

prosecution of criminal cases; that KCDA employees would continue to face issues concerning

the handling of witnesses, *Brady* information, and evidence and argument offered during

criminal proceedings; that proper instruction, training, discipline, and/or supervision would be

likely to lessen or prevent future prosecutorial misconduct; and that failing to use proper

instruction, training, discipline, and/or supervision would lead to future prosecutorial misconduct

and cause deprivations of the constitutional rights of criminal defendants prosecuted by the

KCDA.

220.    Former DA Hynes and his delegates knew of the unconstitutional conduct

occurring among KCDA prosecutors and investigators in light of the numerous credible

allegations, many substantiated by judicial decisions, that prosecutors and investigators

wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution

had been required to timely disclose to the defense under *Brady*; had presented or failed to

correct false or misleading testimony and argument; and/or had abused judicial process to coerce

false or inherently unreliable statements or testimony from witnesses.

221.    Further evidence of the unconstitutional conduct occurring and the need for

proper training, supervision, and discipline practices includes numerous decisions of the United

States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York

Court of Appeals, and the New York Appellate Division, discussing the difficult issues that

regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors

to comply with that rule; and judicial decisions putting the KCDA on notice that the City could

be held liable for its failure to adequately train, supervise, or discipline prosecutors regarding

their *Brady* and related due process obligations, including their obligations not to abuse judicial

process, coerce witnesses, or use false testimony or argument, *see, e.g.*, *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dep't. 2001), *Leka v. City of New York*, No. 04 CV 8784 (DAB), 2006 WL 281621 (S.D.N.Y. Sept. 29, 2006), and *Zahrey v. City of New York*, No. 98 Civ. 4546 (DCP), 2009 WL 54495 (S.D.N.Y. Jan. 27, 2009).

222.    Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City, including the KCDA, perpetuated, or failed to take preventative or remedial measures to terminate said policies, procedures, practices, and/or customs; did not effectively instruct, train, and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies, or procedures for investigating and disciplining prosecutors who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practices, and/or customs, described above, with deliberate indifference to the effect this would have upon the constitutional rights of individuals and citizens of the City and State of New York.

223.    The aforesaid policies, practices, and customs of former DA Hynes and the City of New York were collectively and individually a substantial factor in bringing about the aforesaid violations of Mr. Quezada's rights under the Constitution and laws of the United States, and in causing his wrongful conviction and resulting damages.

224.    Under the principles of municipal liability for federal civil rights violations, former DA Hynes (or his authorized delegates) had final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees in his office regarding

their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence or Brady material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

225.   Former DA Hynes, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline, with respect to his Office's performance and its duties.

226.   The Brooklyn District Attorney at all relevant times was and is an elected officer of Kings County, one of the constituent counties of Defendant City, and the Office was and is funded out of the City's budget.

227.   Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law § 2, and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including Kings County), and hence Defendant City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his employees and agents.

228.   At all relevant times, former DA Hynes, personally and/or through his authorized delegates, had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

229.   By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Mr. Quezada's constitutional rights and his resulting injuries.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Supervisory Liability*

### Against Defendants Cimino and Pica

230.    Mr. Quezada repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

231.    Supervising DI Cimino and Chief DI Pica personally supervised DIs Krelik, Lasala, and Salsarulo, and knew, or in the absence of their deliberate indifference, recklessness, and/or gross negligence should have known, that their subordinate officers deprived Mr. Quezada of his established constitutional rights through misconduct that included, but was not limited to: illegally arresting and imprisoning Mr. Salcedo, coercing Mr. Salcedo to testify falsely against Mr. Quezada, and failing to disclose *Brady* information in violation of Mr. Quezada's due process rights.

232.    Supervising DI Cimino assigned DIs Krelik, Lasala, and Salsarulo to Mr. Salcedo's Hotel Custody and through his leadership and supervision enabled or permitted his subordinate officers to commit the misconduct described above.

233.    Supervising DI Cimino knew, or in the absence of their deliberate indifference, recklessness, and/or gross negligence should have known, that assigned DIs under his supervision, including the DI defendants, acting in a manner consistent with the KCDA's Hotel Custody practices, routinely arrested and detained witnesses extrajudicially; coerced false testimony through threats, intimidation, and imprisonment; and suppressed *Brady* information concerning witnesses who were expected to testify in criminal cases.

234.    Chief DI Pica, as the chief supervisor and a policymaker for the KCDA's

detective investigator squad, had responsibility for the policies, practices, supervision, and training of all DIs, including the DI defendants.

235.    Chief DI Pica created a policy, practice, and/or custom under which unconstitutional practices occurred, including the unlawful arrest, detention, and coercion of uncooperative witnesses under the KCDA's Hotel Custody program; and/or allowed the continuance of such a policy, practice, and/or custom.

236.    Chief DI Pica and Supervising DI Cimino explicitly and implicitly endorsed those Hotel Custody practices, including by creating and/or continuing the policies that enabled them, training DIs to use them, and failing to supervise and/or discipline DIs to prevent or stop them.

237.    Chief DI Pica and Supervising DI Cimino were at all relevant times aware and/or on notice of the fact that KCDA DIs, including the DI defendants, were routinely arresting and detaining witnesses unlawfully, violating the express mandates of court orders (including material witness orders), threatening and intimidating witnesses through their words and actions, and holding witnesses under inherently coercive conditions to induce them to give testimony in a manner desired by law enforcement.

238.    Chief DI Pica and Supervising DI Cimino trained, encouraged, authorized, and/or permitted DIs, including the DI defendants, to ignore statutes, court rules, and judges' orders concerning material witness orders, subpoenas, "*Damiani*" orders, and other court process, and to engage in the abusive practices described above.

239.    By virtue of the foregoing, Chief DI Pica and Supervising DI Cimino are liable for having substantially caused the foregoing violations of Mr. Quezada's constitutional rights and his resulting injuries.

### FOURTH CAUSE OF ACTION

**Malicious Prosecution**

*Under New York State Law*

**Against Defendants Buda, Krelik, Lasala, Salsarulo, and City of New York**

240.    Mr. Quezada repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

241.    The individual capacity defendants, acting in concert with one another and/or others, continued and caused the continuation of criminal proceedings against Mr. Quezada at a time when there was no probable cause for continuation of the criminal proceedings.

242.    By March 12, 1993 (the day Mr. Salcedo testified) at the latest, probable cause for the continuation of criminal proceedings against Mr. Quezada did not exist.  The individual capacity defendants, who knew Mr. Salcedo had been unlawfully arrested, imprisoned, and threatened in an effort to coerce him to testify falsely against Mr. Quezada, knew that there was no probable cause for Mr. Quezada's continued prosecution.

243.    The criminal proceedings terminated in Mr. Quezada's favor.

244.    The individual capacity defendants acted for improper purposes and with actual malice.

245.    Defendant City of New York is liable under the doctrine of *respondeat superior*.

246.    By virtue of the foregoing, Defendants are liable for having substantially caused the foregoing violations of Mr. Quezada's constitutional rights and his resulting injuries.

## FIFTH CAUSE OF ACTION

**Intentional Infliction of Emotional Distress**

*Under New York State Law*

**Against Defendants Buda, Krelik, Lasala, Salsarulo, and City of New York**

247.    Mr. Quezada repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

248.    The individual capacity defendants engaged in a continuing pattern of extreme and outrageous conduct directed at Mr. Quezada from at least March 11, 1993, through the vacatur of Mr. Quezada's conviction and his release from custody on August 31, 2015.

249.    The individual capacity defendants engaged in that pattern of conduct with the intent of causing, or with reckless disregard for the substantial probability that it would cause, severe emotional distress to Mr. Quezada.

250.    The individual capacity defendants' actions proximately caused severe emotional distress to Mr. Quezada.

251.    Defendant City of New York is liable under the doctrine of *respondeat superior*.

252.    By virtue of the foregoing, Defendants are liable for having substantially caused the foregoing violations of Mr. Quezada's constitutional rights and his resulting injuries.

## SIXTH CAUSE OF ACTION

### Negligent Training, Supervision, and Discipline

*Under New York State Law*

### Against Defendant City of New York

253.    Mr. Quezada repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

254.    The City of New York, intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline agents and employees of the KCDA with regard to the matters described above.

255.    The City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Mr. Quezada's wrongful conviction and resulting damages.

WHEREFORE, Plaintiff Ruddy A. Quezada demands judgment against the above-captioned Defendants as follows:

a.    For compensatory damages in an amount to be determined at trial, but not less than 24 million dollars;

b.    For punitive damages against the individual capacity defendants in an amount to be determined at trial, but not less than 20 million dollars;

c.    For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. §1988 and other applicable laws;

d.    For pre- and post-judgment interest as allowed by law; and

e.    For such other relief as this Court deems just and proper.

Dated: January 24, 2017
      New York, New York

                       DAVID B. SHANIES LAW OFFICE

By: _____

David B. Shanies
411 Lafayette Street, 6th Floor
New York, New York 10003
(212) 951-1710
david@shanieslaw.com

*Counsel for Plaintiff Ruddy A. Quezada*